**Ana GECEVIC, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES.**

No. 93–CV–2792 (JS).

United States District Court, E.D. New York.

April 3, 1995.

---

Fine, Olin & Anderson, P.C. by Mark Straus, New York City, for plaintiff.

Zachary W. Carter, U.S. Atty., E.D.N.Y. by Jennifer C. Boal, Asst. U.S. Atty., Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

This action is brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Secretary of Health and Human Services (the "Secretary") that denied plaintiff's application for disability insurance benefits under the Social Security Act (the "Act"). Both plaintiff and the Secretary have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Plaintiff argues that the Secretary failed properly to apply the Second Circuit's "treating physician rule" and, as a result, the Secretary's decision is not based upon substantial evidence. Plaintiff asks this Court to reverse the denial of plaintiff's application and remand the case for a calculation of benefits. In the alternative, plaintiff requests that the Court remand the case so that the Secretary may correctly assess the evidence giving the treating source's opinion greater weight. In her cross-motion for judgment on the pleadings, the Secretary argues that her decision was based upon substantial evidence and that the Court therefore must affirm her final determination. As the Court agrees that the Secretary did not properly apply the treating physician rule, the Court denies both motions for judgment and remands back to the Secretary for further proceedings to allow for a proper evidentiary determination.

## BACKGROUND

Plaintiff Ana Gecevic ("Plaintiff") is a 46–year old Yugoslavian woman who was born on December 10, 1948. (Record ("R.") at 76.) Plaintiff came to the United States in 1976 (R. at 34), and presently lives in an apartment in Queens, New York, with her husband and four of her five children who, at the time of the hearing, ranged from four years to 23 years of age. (R. at 42.) Plaintiff had previously worked as a sewing machine operator at a knitting mill, and was working as a cleaning lady from April 28, 1986 until December 22, 1988, the day of her accident at work. (R. at 141.) Plaintiff is not comfortable with the English language, and had an interpreter by her side during the administrative hearing. (R. at 30–32.)

Plaintiff first applied for disability benefits following her accident at work on December 22, 1988, when she tripped on a carpet and fell forward, striking her forehead, right wrist and hand. (R. at 159, 187.) Plaintiff lost consciousness for two to three seconds, and was taken by ambulance to New York Infirmary Beekman Downtown Hospital where she was treated and released that evening. (R. at 158–160.)

As a result of her complaints of recurring dizziness, back pain, headaches, disorientation, depression and anxiety since the accident, Plaintiff has been seen repeatedly by numerous physicians. This appeal, however, centers on the diagnosis by plaintiff's treating psychiatrist, Dr. Dushan Kosovich, that, as a result of the accident, plaintiff suffers from post-traumatic stress disorder, coupled with "mixed emotional features and panic disorder." (R. at 168.) Accordingly, only the facts relevant to this diagnosis will be addressed in this Memorandum and Order.

Plaintiff was referred to Dr. Dushan Kosovich by a former patient (R. at 181), and was first examined by the psychiatrist on July 7, 1989 (R. at 48, 54, 181.) The doctor continued to treat plaintiff every two to three weeks with psychotherapy and medication up until the day of the administrative hearing. (R. at 169, 181.) Dr. Kosovich testified at the hearing that he had years of training in the psychiatric field, as well as specialized expertise in the area of post-traumatic stress disorder. (R. at 46–47.)

During the administrative hearing, Dr. Kosovich testified that the post-traumatic stress disorder from which plaintiff was allegedly suffering fell within the Secretary's listed impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1 (1994) (hereinafter *Listed Impairments* ), thereby entitling plaintiff to disability benefits. (R. at 53.) The doctor indicated that plaintiff "at times gets confused and, and then irritable, depressed, anxious. Had restless sleep, frightening dreams, flashbacks, afraid to be alone at home, she gets very red, red patches on her face and chest and complaining of forgetfulness and poor concentration." (R. at 49.) Dr. Kosovich testified that plaintiff's condition has prevented her from being able to "go alone any-

where from the house, feels trapped and afraid to be alone home even, she feels—she's afraid to go without somebody, that she would fall down because of this dizziness and weakness." (R. at 52.) As a result of his findings, Dr. Kosovich testified that plaintiff's nonexertional limitations rendered her severely disabled and incapable of working. (R. at 53, 74.) When asked whether he had seen any significant improvement in plaintiff's condition over time, Dr. Kosovich responded, "Unfortunately, not much really because she continues to have, to have the same somatic . . . complaints and somatic symptomology, feeling hopeless, helpless and always—cannot get rid of all these dreams and all these flashbacks and always coming back to her whether during the day or during the sleep, always coming back." (R. at 51.) The doctor added that plaintiff's condition had "become very very chronic," and that his prognosis "for [the] foreseeable future, it's very guarded." (Id.)

Dr. Kosovich attributed plaintiff's condition to her work-related accident in December 1988. He stated during the administrative hearing in response to questioning regarding the event triggering plaintiff's condition,

Well, first of all we don't have any evidence that she ever had any emotional problems before, she was very hard worker and that she was supporting family and taking care of the family during the day and during the night working on a regular basis and she didn't go to sick leaves or any accidents before and we really don't have any evidence that she ever had any emotional problems before or any physical. So I feel that this is definitely casualty related condition of this accident.

(R. at 50.)

Dr. Kosovich's written reports in the record are somewhat inconsistent with his testimony at the hearing. In a report dated November 19, 1990, the doctor also specified a diagnosis of post-traumatic stress disorder with mixed emotional features, panic disorder and hypochondria. (R. at 168.) Dr. Kosovich noted plaintiff's mixture of depression and anxiety, that plaintiff's insight and judgment was "poor" and that plaintiff acted "helpless," "frightened" and "excitable." (R. at 171.) The doctor wrote that plaintiff was "severely impaired—she thinks that she will be sick like now for ever." (Id.)

In a later report dated January 29, 1991, however, Dr. Kosovich reiterated his diagnosis of post-traumatic stress disorder but stated that plaintiff was only a "little anxious" and a "little depressed." (R. at 181.) The doctor also indicated that although he did not "believe she does very much at home, [ ] she does take care of her younger child and does some household chores." (Id.) Dr. Kosovich did note, though, that plaintiff always came to his office accompanied either by her husband or daughter. (Id.)

In March 1991, Dr. Jorge Oldan, a psychiatrist, met with plaintiff at the Secretary's request and conducted a psychiatric evaluation. (R. at 195–198.) In recounting the patient's medical history, Dr. Oldan noted plaintiff's allegations of dizziness, back pain, headaches and depression. Dr. Oldan found that plaintiff was generally responsive and alert and acted in a socially appropriate manner. (R. at 195.) Nevertheless, Dr. Oldan indicated that plaintiff appeared preoccupied with a wide range of somatic complaints and that plaintiff's allegations about her moderately depressed moods were consistent with his findings. (R. at 196.) Dr. Oldan noted that psychotherapy might be of help (R. at 197). He concluded that plaintiff "will probably keep functioning at the same level as now in the near future" and that "post-traumatic stress disorder, with depressed mood" needed to be ruled out as a possible diagnosis. (Id.)

Among the many doctors who treated the physical manifestations of plaintiff's alleged condition, Dr. C. Sharma performed neurological examinations on behalf of the Liberty Mutual Insurance Company on June 5, 1989 (R. at 189–91), and again on March 12, 1990 (R. at 183–85). The doctor noted on both occasions the plaintiff's complaints of pain in her hands, neck, and back, as well as dizziness and poor balance. (R. at 183.) The doctor concluded after both examinations that the plaintiff did not suffer any neurological impairment, her attention and affect were appropriate, there was no evidence of

282

thought disorder or psychomotor abnormality, and that in his opinion, the plaintiff was able to return to full-time work. (R. at 184–85, 190–91.)

A second neurologist, Dr. Robert Blankfein, examined plaintiff on June 12, 1989. (R. at 187–88.) The doctor's report revealed that plaintiff was still complaining of headaches and neck pain, as well as pain in her right middle finger. (R. at 187.) The plaintiff told the doctor that she had poor balance, and claimed she had fallen on five occasions since her accident. (*Id.*) The plaintiff also alleged ringing in her ears, poor vision and trouble sleeping at night. Dr. Blankfein's examination found the plaintiff to have no serious neurological problems. (*Id.*) The doctor noted that the plaintiff was mentally "intact," but "a bit tired at times probably due to the effects of Tranxene," the medication she was using at the time. (*Id.*)

Plaintiff testified at the hearing that since the accident at work she had felt scared, nervous and paranoid. (R. at 37.) Plaintiff alleged that she experienced a loss of memory when she tried to go outside on her own (R. at 41–42), and that her oldest daughter living in the apartment was responsible for the shopping and the household chores (R. at 43–45.) Although she could sometimes dress herself, plaintiff indicated that her daughter occasionally helped her wash and dress. (R. at 43–44.) Plaintiff also revealed that her daughter took care of plaintiff's four-year old son. (R. at 43.)

Plaintiff applied for disability insurance benefits on October 25, 1990. (R. at 76–78.) Plaintiff's application for disability insurance benefits was denied initially (R. at 79–103), and on reconsideration (R. at 104–30.) Plaintiff then requested a hearing before administrative law judge Seymour Fier (the "ALJ") on May 6, 1992. (R. at 28–75.) In an opinion rendered on July 29, 1992, the ALJ concluded that prior to the expiration of plaintiff's insured status for disability benefits, plaintiff was able to perform her past relevant work, and thus was not disabled within the meaning of the Act. (R. at 12, 19.) While noting the greater weight to be given to Dr. Kosovich's opinion under the Second Circuit Court of Appeal's treating physician

rule, the ALJ ultimately found that substantial evidence existed which contradicted Dr. Kosovich's diagnosis. (R. at 17.) The ALJ held that while plaintiff could no longer work as a cleaning woman, she still retained the ability to perform light work and could continue to perform her past relevant work as a sewing machine operator. (R. at 18, 19.) On April 23, 1990, the Appeals Council denied plaintiff's request for a review (R. at 2–3), and this action follows.

## DISCUSSION

The legal principles governing the Court's decision on the instant motions are well-settled. A claimant is entitled to disability benefits under the Act if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(A) (West 1991); *see also Wagner v. Secretary of Health and Human Serv.,* 906 F.2d 856, 860 (2d Cir.1990). The presence of an impairment is thus not in and of itself disabling within the meaning of the Act. *See Spears v. Heckler,* 625 F.Supp. 208, 210 (S.D.N.Y.1985).

The Secretary has promulgated regulations establishing a framework in which to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (1994). Essentially, a five-step analysis of the claimant's alleged disability is to be made:

First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Secretary next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider him disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a

claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Secretary then determines whether there is other work which the claimant could perform. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982) (per curiam). The claimant bears the burden of proof as to the first four steps, while the Secretary bears the burden of proof as to the last step. *See id.; Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir.1984); *Vasquez v. Secretary of Health and Human Serv.*, 632 F.Supp. 1560, 1563 (S.D.N.Y.1986).

■ In evaluating the ALJ's ruling, the Court does not review the administrative record *de novo* but rather considers only whether the Secretary's findings are supported by substantial evidence. 42 U.S.C.A. § 405(g) (West 1991 & Supp.1994); *see also Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991); *Wagner*, 906 F.2d at 860; *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir.1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)); *see also Wagner*, 906 F.2d at 860 (citing *Richardson*, 402 U.S. at 401, 91 S.Ct. at 1427). "The substantial evidence test ... applies not only to the Secretary's findings of fact, but also to the inferences and conclusions of law to be drawn from such facts." *Smith v. Shalala*, 856 F.Supp. 118, 121 (E.D.N.Y.1994) (internal quotations and citations omitted); *see also Vasquez*, 632 F.Supp. at 1563 (citations omitted); *Rodriguez v. Califano*, 431 F.Supp. 421, 423 (S.D.N.Y.1977) (citations omitted).

In the instant case, the ALJ found that plaintiff was not engaged in employment since her accident at work in December, 1988 (R. at 12), and that while the accident affected plaintiff's ability to perform work-related activities, plaintiff did not have a Listed Impairment (R. at 16). In reaching this determination, the ALJ found contradicted by substantial evidence the medical findings of plaintiff's treating physician, Dr. Kosovich, who testified that plaintiff's ailments met the requirements of Sections 12.04 (Mood Disorders) and 12.06 (Anxiety Disorders) of the Listed Impairments, rendering plaintiff incapable of working. (R. at 52–53.)

The Second Circuit Court of Appeals has held that the ALJ's fact-finding process is bound by the "treating physician rule." This rule provides that,

> [A] treating physician's opinion on the subject of medical disability, i.e., diagnosis and nature and degree of impairment is: (i) binding on the fact-finder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians, although resolution of genuine conflicts between the opinion of the treating physician with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder.

*Schisler v. Heckler*, 787 F.2d 76, 81 (2d Cir. 1986) (citations omitted) [hereinafter *Schisler I*]; *see also Evangelista v. Shalala*, 1993 WL 277844, at *4–5, 1993 U.S. Dist. LEXIS 10003, at *12–13 (quoting *Schisler I, id.*).

The Secretary issued new regulations on August 1, 1991 (the "*1991 Regulations*") addressing the weight to be accorded to medical opinions of treating physicians. *See* 20 C.F.R. §§ 404.1527 and 416.927 (1994). The 1991 Regulations state that a treating physician's opinion will be given controlling weight regarding the nature and severity of a plaintiff's impairment if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). These regulations "accord less deference to unsupported treating physician's opinions than do [prior] decisions" in the Second Circuit. *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993) [hereinafter *Schisler II*]. Despite

this lesser degree of deference, the Second Circuit held on August 23, 1993, a few months after the Appeals Council affirmed the ALJ's denial of benefits in this case, that the 1991 Regulations were not "arbitrary or capricious," and found them binding on the circuit's district courts. *Id.* at 568.

The preliminary question to be decided in this appeal is whether the Court should apply the treating physician standard set forth in the 1991 Regulations in reviewing the instant motions or the *Schisler I* standard used by the ALJ. The Government has essentially conceded in its brief that, even though it is more favorable to plaintiff, the same standard used by the administrative agency, the *Schisler I* standard, should be used by the Court in evaluating the instant motions. The Court concurs with the Government's position.

The Supreme Court has held that

Retroactivity is not favored in the law. . . . [A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.

*Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 472, 102 L.Ed.2d 493 (1988). Relevant, therefore, to a determination of whether the 1991 Regulations should be applied retroactively is whether the Secretary has express power to promulgate rules with retroactive effect involving the level of proof required to establish a disability. The Secretary does not appear to have such express power; Congress granted the Secretary authority simply to "adopt reasonable and proper rules and regulations to regulate and provide for the nature and extent of the proofs and evidence and the method of taking and furnishing the same in order to establish the right to benefits hereunder." 42 U.S.C.A. § 405(a) (West 1991 & Supp. 1994); *cf. National Labor Relations Board v. Long Island College Hosp.*, 20 F.3d 76, 81 (2d Cir.1994) (discussing the absence of express power under the Administrative Procedure Act to promulgate certain retroactive rules).

Nor does the fact that this case was pending on appeal at the time the 1991 Regulations were upheld by the Second Circuit allow the regulations to be applied retroactively "within an exception to the rule against retroactive application for cases 'pending on appeal' from an 'initial adjudication' at the time the new law was enacted." *Long Island College Hosp.*, 20 F.3d at 81 (quoting *Butts v. City of New York*, 990 F.2d 1397, 1410–11 (2d Cir.1993)). In *Long Island College Hospital*, *id.*, the Second Circuit declined to apply retroactively a new NLRB regulation to a case that was pending on appeal at the time the regulation was issued. The Second Circuit emphasized that the case involved "an *agency's* retroactive application of *its own rules*," *id.* (emphasis in original), and was thus distinguishable from *Butts*, 990 F.2d at 1410–11, in which the Second Circuit discussed the possibility of retroactivity in cases pending on appeal where a statute is changed by legislative enactment during the pendency of the appeal. *Long Island College Hosp.*, 20 F.3d at 81; *see also Nutkins v. Shalala*, 1994 WL 714252, at *3, 1994 U.S. Dist. LEXIS 18416, at *11 (N.D.N.Y. December 21, 1994) (relying on *Long Island College Hosp.* in holding the 1991 Regulations inapplicable in an appeal of an agency determination where the Second Circuit's ruling in *Schisler II* was handed down during the pendency of the appeal); *cf. Cardillo v. Shalala*, 1994 WL 263412, at *2, 1994 U.S. Dist. LEXIS 7847, at *5 (S.D.N.Y. June 13, 1994) (finding the 1991 Regulations applicable where the case was pending on appeal when the regulations were upheld in *Schisler II*); *Odorizzi v. Sullivan*, 841 F.Supp. 72, 76 (E.D.N.Y.1993) (relying on *Butts* to reach the same holding as in *Cardillo*).

Based on the Second Circuit's ruling in *Long Island College Hosp.*, 20 F.3d at 81, the Court holds that the degree of deference accorded to treating physician opinions prior to *Schisler II* must used in determining whether the ALJ's decision in this case was supported by substantial evidence. Applying this standard, the Court concludes that the ALJ's repudiation of the treating physician's diagnosis was unsupported by substantial evidence and that the ALJ therefore failed to

give Dr. Kosovich's medical opinion its proper weight.

In rejecting Dr. Kosovich's opinion, the ALJ relied on the medical reports of two neurologists, Dr. Sharma and Dr. Blankfein. (R. at 17.) The ALJ also noted that plaintiff's physical activities at home contradicted such a finding. (*Id.*) Neither of the physicians, however, examined plaintiff with respect to her psychological complaints or saw plaintiff over a considerable period of time. (*Id.*) Dr. Sharma basically examined plaintiff twice, and Dr. Blankfein once, in order to conduct consultative examinations on behalf of Liberty Mutual Insurance Company, the worker's compensation insurance company responsible for paying plaintiff's worker's compensation disability benefits. Dr. Sharma basically conducted neurological examinations on both occasions and did not find any neurological impairments. (R. at 183–85, 189–91.) Dr. Blankfein's report of June 12, 1989 states that his "neurological examination revealed a forty year old Yugoslavian woman with a normal station and gait." (R. at 187.)

It is not surprising that, given their limited focus on plaintiff's neurological abilities and the brief period of time in which they examined plaintiff, Dr. Blankfein and Dr. Sharma did not diagnose plaintiff as having a mental impairment. Indeed, that "a doctor is not likely to distinguish between anxiety and a more serious mental condition during a cursory examination is precisely the reason for the 'treating physician rule.'" *Mazza v. Secretary of Health and Human Servs.*, 1989 WL 5269, at *4, 1989 U.S. Dist. LEXIS 605, at **10–11 (E.D.N.Y. Jan. 10, 1989); *McLaughlin v. Sullivan*, 1990 WL 121607, at *3, 1990 U.S. Dist. LEXIS 10661, at *7 (S.D.N.Y. Aug. 16, 1990) ("The rationale of [the treating physician] rule, and therefore a condition of its application, is that the treating physician's continuity of treatment puts him in a unique position to make a complete and accurate diagnosis." (citations omitted)).

Moreover, both doctors saw plaintiff for brief examinations of physical complaints on behalf of a party with an interest in minimizing plaintiff's impairments. *See Diaz v. Secretary of Health and Human Servs.*, 855 F.Supp. 56, 59 (E.D.N.Y.1994) (citations omitted). "'[A] report submitted by a witness whose self-interest may well have dictated its contents cannot and should not be permitted to constitute substantial evidence.'" *Odorizzi*, 841 F.Supp. at 78 (quoting *Cullinane v. Secretary of Health and Human Servs.*, 728 F.2d 137, 139 (2d Cir. 1984)).

Additionally, as Dr. Kosovich is an expert specializing in the field of psychiatry with special training in the area of post-traumatic stress disorder (R. at 47), the ALJ should have, but did not, accorded his opinion regarding plaintiff's psychological state greater weight. *See Marsillo v. Bowen*, 1987 WL 18165, at *4, 1987 U.S. Dist. LEXIS 14859, at **11–12 (E.D.N.Y. Sept. 30, 1987) ("The Secretary is entitled to give greater weight to the opinion of a physician specializing in the field of plaintiff's impairment, rather than an opinion of a general practitioner." (citations omitted)); *Lombardo v. Schweiker*, 749 F.2d 565, 566 (9th Cir.1984) (citations omitted). The 1991 Regulations confirm the appropriateness of this practice. *See* 20 C.F.R. § 404.1527(d)(5) (1994) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Although Dr. Kosovich warned that neurologists in the United States did not typically have extensive training in psychiatry, the ALJ was apparently swayed, by a belief that since some of the consultative physicians were specialists in neurology, and since the field of neurology embraced that of psychiatry, these consultative physicians would be able in one or two examinations to diagnose a psychiatric ailment. (R. at 68.)

It is illuminating that the Secretary's own consulting psychiatrist, Dr. Oldan, does not contradict Dr. Kosovich's diagnosis. Rather, Dr. Oldan concluded that plaintiff was probably moderately depressed and might be suffering from post-traumatic stress disorder. Despite the fact that Dr. Oldan was the only psychiatrist, other than Dr. Kosovich, to examine plaintiff, the ALJ inexplicably fails even to mention his report in denying plaintiff disability benefits. At the very least, the

ALJ owed plaintiff an explanation as to why Dr. Oldan's findings were being disregarded. While the ALJ is not obligated to "reconcile explicitly every conflicting shred of medical testimony," *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir.1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981), he cannot simply selectively choose evidence in the record that supports his conclusions, *Fiorello*, 725 F.2d at 176; *Andino v. Bowen*, 665 F.Supp. 186, 190 (S.D.N.Y.1987) (*citing Fiorello, id.*).[1]

The ALJ also seems to have failed to consider in his ruling a report favorable to plaintiff prepared by a social worker who visited plaintiff's home on October 5, 1991. The social worker indicated in her report that she found plaintiff to be fearful, disoriented and pressured. (R. at 203.) She also noted that plaintiff had trouble concentrating and breathing. (*Id.*) Again, the ALJ should have provided some explanation for disregarding this favorable evidence.

The ALJ attempts to discredit Dr. Kosovich's medical opinion by noting that the doctor's written reports regarding plaintiff's inability to work were not prepared until November 19, 1990 (R. at 15, 168–73) almost eleven months after plaintiff's disability insured status ended on December 31, 1989 (R. at 151). The Secretary argues that as plaintiff's impairment must be disabling prior to the expiration of her insured status, *see* 42 U.S.C.A. § 416(i)(2)(C) (West 1991), and as Dr. Kosovich's reports during that period do not indicate that plaintiff was suffering from a disabling mental impairment, plaintiff was not disabled within the meaning of the Act prior to the expiration of her insured status.

▉ The fact that a diagnosis is not made contemporaneously within the period that a claimant is insured does not undercut the viability of a later diagnosis based upon medically acceptable techniques. *Wagner*,

906 F.2d at 861. A diagnosis of plaintiff's condition may properly be made several years subsequent to the onset of the disability. *Rivera v. Sullivan*, 923 F.2d 964, 968–69 (2d Cir.1991); *Wagner*, 906 F.2d at 861; *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir.1981); *Golden v. Secretary of Health and Human Servs.*, 740 F.Supp. 955, 961 (W.D.N.Y.1990). The Social Security Administration's own internal rulings leave open the possibility that a diagnosis may properly be made after expiration of a claimant's insured status. *See* Social Security Ruling 83–20, Social Security Reporting Service (West 1993). Social Security Ruling 83–20 requires the Secretary to accept a claimant's onset date for a disability "if it is consistent with all the evidence available." *Id.* at 51.

Dr. Kosovich indicated that the onset date of plaintiff's disability was December 22, 1988, the day of her accident at work. (R. at 49–50, 74.) Dr. Kosovich testified that plaintiff had worked without complaint prior to the accident. He attributed his delay in diagnosing plaintiff with post-traumatic stress disorder to his desire to meet with her "several times and to see how they respond to the medication and to psychotherapy." (R. at 56.)

Even the physicians consulted by the Secretary found the date of plaintiff's accident critical in understanding the origin of her medical problems. Dr. Sharma noted in both of his medical reports that plaintiff's condition appears related to the incident of December 22, 1988. (R. at 185, 191.) Dr. Blankfein attributes plaintiff's post-traumatic headaches to her fall at work. (R. at 188.) Dr. Oldan wrote in his psychiatric evaluation that plaintiff has no history of somatic complaints prior to the December 1988 accident. (R. at 196.) Accordingly, the record does not

1. Two other physicians, Drs. Singer and Curley, also conducted psychological examinations of plaintiff and found plaintiff capable of returning to the work force. The Court was informed by the parties, however, that neither of these doctors actually examined plaintiff but based their evaluations on the record. The Court is not inclined to rely on these reports as the basis for upholding the ALJ's decision. An opinion of a non-examining doctor by itself cannot usually constitute the contrary substantial evidence required to override the treating physician's diagnosis. *Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir.1987). Nor is there any indication that these physicians had any special training in psychiatry or psychology. Moreover, even one of these doctors, Dr. Singer, acknowledged that plaintiff's capacity to work was limited: Claimant "should be able to perform some type of routine low pressure [work] not involving extensive travel, concentration or contact with the public." (R. at 91.)

justify discrediting Dr. Kosovich's findings merely because they were rendered after plaintiff's insured status ended.

█ Although the Court concludes that the Secretary's decision was not supported by substantial evidence, thereby warranting reversal, the inconsistencies in Dr. Kosovich's findings and the ALJ's failure to inquire appropriately into plaintiff's functional abilities require that the case be remanded for further proceedings.

Dr. Kosovich's testimony at the administrative hearing and his report dated November 19, 1990 were somewhat inconsistent with his report dated February 18, 1991. In his 1991 report, Dr. Kosovich indicated that plaintiff was only "a little anxious" and a "little depressed." In the 1990 report and in his hearing testimony, on the other hand, Dr. Kosovich stated that plaintiff was severely impaired and that her prognosis was guarded. This discrepancy is troubling. Examination of Dr. Kosovich's charts might offer assistance in reconciling Dr. Kosovich's findings. Although Dr. Kosovich volunteered during the hearing to allow the ALJ to examine his physician charts, the record does not contain any such materials. Before discrediting Dr. Kosovich's opinion, the ALJ should have considered requesting disclosure of Dr. Kosovich's records. *See DiBenedetto v. Secretary of Health and Human Servs.*, 1993 WL 41762, at *2, 1993 U.S. Dist. LEXIS 1987, at *6 (E.D.N.Y. Feb. 9, 1993) (citations omitted). Indeed, the Act requires that the Secretary "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability. In making any determination the Secretary shall make every reasonable effort to obtain from the individual's treating physician ... all medical evidence ... necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C.A. § 423. The Court also notes that Dr. Kosovich gave the impression at the hearing that he may not have known plaintiff as well as he claimed. Around the time of plaintiff's accident, plaintiff had just delivered her youngest child. At

the hearing, Dr. Kosovich revealed that he may not have been aware of that fact. An examination of Dr. Kosovich's charts may show more explicitly the degree to which Dr. Kosovich's diagnosis was rooted in knowledge of plaintiff's medical and work history.

In finding Dr. Kosovich's opinion contradicted by substantial evidence, the ALJ relied heavily on Dr. Kosovich's statement in his 1991 report that plaintiff "takes care of her younger child and does some household chores." (R. at 181.). The ALJ thus discredited plaintiff's testimony at the hearing that her daughter is responsible for the household and takes care of the child. Given plaintiff's contradictory testimony, the vague description by Dr. Kosovich of plaintiff's responsibilities and the social worker's report confirming that plaintiff's 21–year old daughter had "essentially taken over her mother's responsibilities" (R. at 203.), the ALJ should have made further inquiry at the hearing of both plaintiff and Dr. Kosovich on this matter. The Secretary is required to develop a complete evidentiary record even when a claimant is represented by counsel, a requirement that follows from the fact that "a hearing on disability benefit entitlement is not an adversarial proceeding." *Ceballos v. Bowen*, 649 F.Supp. 693, 698 (S.D.N.Y.1986); *see also Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir.1982); *Decker v. Harris*, 647 F.2d 291, 299 (2d Cir.1981). The Secretary's willingness to disregard plaintiff's testimony without fully ascertaining the scope of plaintiff's household responsibilities is particularly troubling given the Second Circuit's admonition that a claimant, such as plaintiff, "with a good work record is entitled to substantial credibility when claiming inability to work because of a disability." *Stieberger v. Sullivan*, 738 F.Supp. 716, 742 (S.D.N.Y.1990); *see also Rivera v. Schweike*, 717 F.2d 719 at 725 (2nd Cir.1983); *Singletary v. Secretary of Health, Education and Welfare*, 623 F.2d 217, 219 (2d Cir.1980).

The ALJ also construed against plaintiff the fact that she flew to Yugoslavia in the summer of 1991. The ALJ never, however, determined at the hearing whether plaintiff had difficulty during the trip or whether she was accompanied by family members the en-

tire time. The ALJ was incorrect in assuming, without further inquiry, that the trip to Yugoslavia exemplified that plaintiff was capable of using public transportation given the repeated assertions by plaintiff that she was afraid to travel anywhere without a family member and the statements from physicians in the record that plaintiff always was accompanied by a family member during her appointments. *See Andino*, 665 F.Supp. at 192 (inability of plaintiff to take public transportation substantiates finding of disability).

Finally, in concluding that plaintiff was capable of returning to her past work as a sewing machine operator, the ALJ also appears to have failed to consider the level of responsibility and concentration required of this type of work. The Secretary's own consultant, Dr. Singer, had stated in a psychological evaluation based on the record that plaintiff could only perform "low pressure" tasks not requiring a certain degree of "concentration." (R. at 91.) The Court cannot uphold a decision finding a party capable of performing certain work when the record contains no indication that the ALJ considered the requirements of the job and the party's ability to meet them.

## CONCLUSION

For the reasons stated above, the parties cross-motions for judgment on the pleadings are denied, and the case is hereby remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order.

SO ORDERED.